DUNKLEY CO. v. HUNTLEY MFG. CO. (two cases).

(District Court, W. D. New York. July 12, 1922.)

1. Patents ⬤⟶216—Breach by plaintiff held to release defendant from contract.

A contract by which defendant was given the right to sell patented machines, to be manufactured by plaintiff, for one year, *held* broken by plaintiff's refusal to fill orders taken by defendant, and not thereafter binding on defendant.

2. Patents ⬤⟶328—1,256,885, for cherry-pitting machine, held not infringed.

The Dunkley patent, No. 1,256,885, for cherry-pitting machine, as limited by the state of the art, *held* not infringed by the machine of the Morse patent, No. 1,336,852.

In Equity. Suits by the Dunkley Company against the Huntley Manufacturing Company. Decrees for defendant.

Fred L. Chappell and Harry C. Howard, both of Kalamazoo, Mich., and Lyman M. Bass, of Buffalo, N. Y., for plaintiff.

Fred Gerlach, of Chicago, Ill., and C. G. Babcock, of Buffalo, N. Y., for defendant.

HAZEL, District Judge. Two suits in equity by the Dunkley Company against the Huntley Manufacturing Company are before me on evidence relating in the first suit to infringement by defendant of patent No. 1,256,885, issued to Melville E. Dunkley on February 19, 1918, for a cherry-pitting machine, and in the second suit to contractual violation by defendant arising from a sales contract by which defendant transferred its cherry-pitting business to the plaintiff. As these actions are between the same parties, both arising out of the same transactions, they were tried together, and are both decided in this opinion.

⬤⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

The relations of the parties had their beginning in license agreements for use of the S. J. Dunkley patent, dated November 1, 1909, and February 14, 1913, respectively, by which defendant agreed to pay a royalty on sales of cherry-pitter machines of the various kinds that had been completed by the plaintiff. Pursuant to the license under a later agreement, defendant manufactured patented cherry-pitter machines and sold the same to the trade. Irf such later agreement it was stated that plaintiff had completed an improved cherry-pitting machine, which it would permit defendant to manufacture upon payment of $1,400 for expense of development of the new machines and a royalty on all sales of $200. Fifteen machines, at least, were to be manufactured by the licensee during the first three years, and upon failure to do so plaintiff reserved the right to annul the contract and take over the patterns and drawings of the licensees at cost price. Defendant continued marketing the improved machine under its license, which was designed to meet the competition of the Foote pitting machine, then and since the year 1913 known to the trade. The Foote pitting machine had staggered cells for holding the cherries in the drum, and the improved Dunkley machine embodied a somewhat similar arrangement. Foote claimed at the time that it was an infringement of his patent.

Plaintiff did not manufacture its machines at the time, but, following the threat of infringement suits, it acquired a plant for doing so, and thereupon, pursuant to another agreement, dated February 26, 1916, bought the cherry-pitter business of the defendant for $5,186.39, which at said time was owing $1,500 for back royalties on the pre-existing arrangement. In purchasing of defendant the jigs, templets, and materials on hand at cost, plaintiff credited defendant with the royalties due on all its sales. The agreement also provided for the manufacture by defendant of twelve No. 4 machines for $5,700 during the period that plaintiff's plant was under construction. In effect, defendant surrendered its license rights to manufacture and sell the pitting machines under the earlier agreements, and transferred to plaintiff the instrumentalities for their manufacture, but it retained the exclusive right for one year (and thereafter until canceled by either party) to sell the machines that were to be manufactured by plaintiff. In consideration of the cancellation of prior contracts and licenses, defendant had the privilege of selling, not only so-called Midget No. 1 and No. 3 cherry pitters, but also the No. 4, and repair parts, on a commission basis of 20 per cent. on the sales prices to be fixed by plaintiff. The No. 4 machines were used with other equipment and were to be sold only upon first receiving the written consent of plaintiff. Defendant had the right for one year from the date of the agreement (and thereafter until canceled by either party) to solicit from the trade the installation of cherry-handling equipment, consisting of pitting machines, stemming machines, and their attachments or combinations. It was also agreed that defendant should deliver to plaintiff a list of purchasers and lessees of the pitter machines that had been manufactured or sold by it, and refer all inquiries of customers of such ma-

chines to plaintiff. On April 12th, however, the existing contract was mutually canceled, notice of the termination being given by plaintiff.

It is claimed by plaintiff that defendant, in violation of the existing contract, did not turn over inquiries of customers or prospective buyers as had been agreed; that it broke the contract by continuing the business on its own account, and in 1917 marketed a similar cherry-pitting machine, one that is an infringement of its patent No. 1,256,885.

The relief demanded in the second action, which for convenience will be determined first, is that defendant be required to turn over to plaintiff all the business of defendant relating to cherry-pitting machines, together with inquiries of customers and prospective customers, and account for all profits since February 26, 1916, the date of the agency agreement. Defendant, in opposition, contends that the contract was first broken by plaintiff, owing to its refusal to accept orders for pitter machines which defendant had obtained, and hence the latter had the right to rescind the agency contract.

[1] The intention of the contracting parties, as evidenced by the contract, was that each party should release the other from performance of prior licenses and agreements, and that defendant should become agent for plaintiff, with authority to sell the Midget No. 1 and No. 3 machines and repair parts, and also No. 4 on receiving written consent from plaintiff to do so. Consent in writing as to No. 4 pitters were required, because plaintiff wished to sell them in connection with other equipment and under specific arrangement with purchasers and users. In compliance with the terms of the contract the defendant, after making the contract, negotiated sales of different types of pitting machines. Defendant had customers for small and large machines and for repair parts, and urged plaintiff to assent to sales and make deliveries of orders. But plaintiff delayed to fill orders for No. 4 pitters to the Cobb, Clark, and Case companies, and after at first consenting thereto, it later refused to do so.

The correspondence with relation to such orders for No. 4 pitters, considered in connection with the conversation had by the witness Chapman with Mr. Dunkley, wherein the latter stated "go ahead and take these orders," which Chapman says he acted upon, constituted a waiver in my opinion as to such orders of the provision relating to obtaining consent in writing before making sales. These orders were subsequently repudiated by plaintiff, but defendant had then already agreed to deliver the machines. It may fairly be inferred from the correspondence that the repudiation of these orders was due to plaintiff's desire to lease the No. 4 pitters at a rental, instead of selling them. By the withdrawal of consent to sell them, defendant was deprived of its commissions on the sales. Other letters in evidence, written by plaintiff to various prospective customers of defendant, are open to the inference that its position at such time was that the defendant did not have the right to sell, or agree to sell, any of the types of machines. Following the repudiation of the Cobb, Clark, and Case orders, defendant regarded the contract as broken and terminated, and I find that the evidence warrants the conclusion that, since plaintiff refused

285 F.—25

to perform, the defendant was released from the conditions to which it was bound. Carlin v. Frey, 157 App. Div. 84, 141 N. Y. Supp. 580; Lovell v. St. Louis M. L. I. Co., 111 U. S. 264, 4 Sup. Ct. 390, 28 L. Ed. 423.

Plaintiff, however, contends that, though permission to sell the cherry-pitting machines was terminated by its formal notice, the provision relating to delivery of a list of customers and inquiries for machines was executed, and defendant was strictly bound to compliance. There was, however, compliance regarding the delivery of machines, material, patterns, and inquiries. The inquiries of customers and contracts for machines were submitted to plaintiff by defendant, as the correspondence included in Exhibit 36 sufficiently shows. Such submission, however, was discontinued when plaintiff in June, 1916, in plain terms refused permission to sell pitter machines on various orders heretofore mentioned. Defendant was not required to continue deliverance of inquiries after repudiation of the contract relating to sales, and indeed it then had the right on its own account to continue the business of manufacturing and vending machines that were not an infringement of plaintiff's patent. The contention that only subdivision 4 of the contract was terminated, and that the provision relating to turning over inquiries and contracts after such termination remained in force and effect, is not maintainable. In this view of the contractual relations between the parties and their termination, the bill is thought without equity, and must be dismissed, with costs.

[2] As to the Dunkley patent: The action is on claims 1, 5, 6, 7, 8, and 9. Claim 7 includes a spiral brush with backing means, but this element admittedly is not embodied in defendant's structure. Cherry-pitting machines of the type illustrated in the drawing attached to the specification are provided with a large revolving drum, with a series of small cuplike cavities in the periphery, wherein the cherries are separately carried; they being passed thereto from a chute located on one side of the drum. The chute by appropriate mechanism is given a shaking movement, which scatters the cherries throughout the width thereof, and delivers them to the cup-shaped cavities in the drum. The drum in its step by step rotations brings the cavities or depressions bearing the cherries (they are placed in the cavities by a revolving brush) under a series of plungers, which move upward and downward, to force the pits through the cherries into a chamber where a rapidly rotating spiral brush, mounted on a metallic backing, strikes the pit a sharp blow, which then drops into a conveyor and is carried to the discharge spout, while the cherries in the cavities are carried forward with the movement of the drum until they reach the ejector plungers, which force them into a delivery chute. It will suffice to set forth claim 6, which is believed to be the broadest, and includes means within said chamber for wiping the pits from the plunger and then conveying them. It reads:

"6. In a machine of the class described, the combination of a rotatably mounted hollow drum provided with a plurality of cherry-receiving cavities, each having a pit-discharging opening through the drum, means for driving said drum with an intermittent movement, a plurality of pitting plungers, a pit-receiving chamber within said hollow drum, provided with a plurality of

perforations disposed to permit the passage therethrough of the pits forced from the cherries by the pitting plungers, means within said chamber for wiping the pits from the pitting plungers and carrying them to the discharge end of the chamber."

The prior state of the art, in my opinion, requires limiting the claims in suit to a spiral brush, connected to a shaft within the pit-receiving chamber and coacting means for driving the same. By the specified means for driving the shaft the spiral brush operates to wipe the pits from the end of the plunger and then carries them to the outside of the drum. The combination, consisting of a revolving drum with stoppages and depressions in the surface, chutes for holding quantities of cherries, punches operating by upward and downward strokes for driving the pits through the cherries, and their mode of conjoint operation were well-known features in such machines at the date of the invention in suit. According to the specification the invention is an improvement of the cherry-pitting machines described in the patent to Samuel J. Dunkley, dated November 1, 1910 (No. 974,759), which embodies such elements. In the earlier Dunkley machine the plunger was provided with a narrow neck above the cutting part, together with a support having a fixed part of rubber material with radial slits to form prongs which fitted into notches. In operation the pits and pulp were removed from the notches of the plunger device on its upward stroke from the rubber stripper, and by an endless conveyor carried to the outside of the drum. Its efficiency was somewhat impaired, because it was necessary at intervals to replace the rubber strippers, resulting in some waste of the juices of the cherries and in retarding the work.

The patent to Foote, No. 1,024,625, of April 30, 1912, was successfully used to achieve the desired result. The pitter machine is of the intermittent revolving drum and punch type. It has rubber pit wipers and a screw conveyor for carrying the pits in the trough positioned within the drum to the outlet. Other patents of the rotatable type, operating in substantially the same way as plaintiff's machine, are cited to narrow the claim to a rotating spiral brush for wiping the cherry pits from the ends of the pitting punches and then carrying them and juices to the outer end of the chamber. The evidence satisfactorily shows that in prior apparatus of this description there are shown means of one kind or another (of which the rubber strippers are an example) for removing the pits from the punches during the stroke, and moreover each machine had instrumentalities for conveying the pits to the end of the cylinder; some using a conveyor as in the Foote, Knapp, and Fenn patents. These instrumentalities, however, appear to have been used separately, without joint coaction, while in plaintiff's patent the spiral brush served the dual purpose of wiping the pits off the punches and then by coaction conveying them to the outlet.

The validity of the claims, if restricted to the structure described, is not in serious controversy. The question arises whether their scope warrants including within them the defendant's construction described in the Morse patent, No. 1,336,852. In its machine, in combination with an intermittent rotary drum having cherry cavities, plungers, and

receiving chamber, is embodied a trough located within the drum on the upper side. Extending lengthwise is a slidable rod in stationary bearings, which has a series of rubber strips fixed to collars. These rubber strips are caused to move lengthwise with the rod. Their upper ends wipe the pits from the intermittently moving punches, which then fall into the trough and are carried to the discharge spout by a metallic spiral cam or screw conveyor affixed to the sprocket wheel for intermittent operation. The rubber wipers are all separated for the sets of pitting plungers. Plaintiff claims that defendant's structure merely consists of additional parts, and is in fact an evasion of the patent in suit, and that its adaptation comprises equivalent means of achieving the same results as those described and achieved by the use of the patent in suit. I have reached a negative conclusion. Plaintiff's advance over prior structures was not of such importance as to permit applying the rule of equivalency. The defendant has no spiral brush for wiping the pits from the plungers and conveying them to the outlet; its metal screw or spiral conveyor is a carrier of the pits only, and has no relation whatever to the wiping instrumentality, which reciprocates longitudinally of the drum and is operated by a spring and cam. The rubber strips and screw conveyor do not coact with the plunger, as does the wiping and conveying spiral of plaintiff's patent. Indeed, the sole function of defendant's screw conveyor is to carry the pits as shown in the prior Foote, Knapp, and Fenn patents. The same result, it is true, is accomplished by defendant's machine as in plaintiff's, but not in the same way. There is no joint or coacting of any spiral brush to wipe the pits off and convey them away.

Defendant's apparatus is not an infringement, neither of plaintiff's causes of action is proven, and both complaints are dismissed, with costs.